714 P.2d 1293

Jeanette R. HENDERSON, a single woman, Plaintiff-Appellee,

v.

GARDNER MECHANICAL CONTRACTORS, INC., Defendant-Appellant,

STATE COMPENSATION FUND, Plaintiff-Appellant,

v.

Jeanette R. HENDERSON, a single woman; Gardner Mechanical Contractors, Inc., Defendants-Appellees,

No. 1 CA–CIV 7015.

Court of Appeals of Arizona, Division 1, Department A.

Sept. 19, 1985.

Review Denied March 4, 1986.

R. Y. Thrasher, P. C. by R. Y. Thrasher, Phoenix, for plaintiff-appellee.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.C. by Richard J. Woods, Larry L. Smith, Weyl, Guyer, McBan & Olson by Barry A. MacBan, Thomas G. Bakker, Phoenix, for defendant-appellee, Gardner Mechanical Contractors.

Campana & Horne, P.C. by James E. Vieh, Scottsdale and State Compensation Fund, Robert K. Park, Chief Counsel by John R. Greer, Phoenix, co-counsel for State Compensation Fund.

## OPINION

JACOBSON, Chief Judge.

Two issues are presented by this appeal: (1) Whether Employer's Liability coverage is automatically afforded to an employer for work related injuries incurred by an employee who has rejected workers' compensation coverage; and (2) What is a "hazardous occupation" under the Employer's Liability Law?

These issues arise out of a consolidation of two actions seeking a determination of liability for on-the-job injuries incurred by an employee who had previously rejected the protection of the Workers' Compensation Act. The first, a personal injury action brought by the employee, Janet R. Henderson (Henderson) against her employer, Gardner Mechanical Contractors, Inc. (Gardner), was based upon a slip and fall in her employer's office hallway. The second, a declaratory judgment action brought by the State Compensation Fund (Fund) and other insurers [1] sought a determination that the Fund owed no duties or obligations to Gardner arising out of the Henderson accident.

Gardner is an air conditioning and heating contractor for commercial building projects. Henderson was employed by Gardner as an estimator to work in the office. A few weeks after Henderson began her employment, Gardner's president, Paul Vermani (Vermani) requested that she sign an "Employee's Notice of Rejection of the Arizona Workers' Compensation Law." Vermani testified that he believed office workers could not receive workers' compensation benefits and, therefore, he was paying premiums on these workers needlessly. In accordance with Vermani's request, Henderson signed the form.

The Fund received the Notice of Rejection and sent an endorsement to Gardner which acknowledged that Henderson was no longer requesting workers' compensation insurance. The endorsement contained two pages, the first of which contained Henderson's name and the effective date of the rejection. The second page contained the following:

EMPLOYER—PLEASE READ

INSURANCE AFFORDED BY YOUR POLICY UNDER COVERAGE A, WORKMAN'S COMPENSATION AND COVERAGE B, EMPLOYER'S LIABILITY, DOES NOT APPLY TO INJURY, INCLUDING DEATH RESULTING THEREFROM, SUSTAINED BY ANY EMPLOYEE WHO ELECTS TO REJECT THE ACT.

HOWEVER, IN CONSIDERATION OF THE PAYMENT OF PREMIUM UPON THE EARNINGS OF THE EMPLOYEE WHO REJECTS THE LAW, THE POLICY SHALL COVER THE EMPLOYER AGAINST LOSS UNDER COVERAGE B, EMPLOYER'S LIABILITY, OF THE POLICY.

IF YOU DESIRE COVERAGE UNDER THE LIABILITY PORTION OF THE POLICY, COVERAGE B, PLEASE REQUEST SAME IN WRITING, STATING THAT THE EMPLOYER IS WILLING TO PAY PREMIUM ON THE EARNINGS OF THE EMPLOYEE WHO REJECTS THE ACT. PLEASE SUBMIT THE REJECTOR'S NAME, SALARY AND CLASSIFICATION TO WHICH HIS PAYROLL IS ASSIGNED. UPON RECEIPT OF SAME, WE WILL ISSUE AN ENDORSEMENT FOR COVERAGE.

At trial, Vermani acknowledged receiving this endorsement but stated that he did not read it. Henderson was subsequently assigned to some job sites for inspection and balancing of the equipment. Since Henderson was now performing more than office work, Vermani testified that he believed she should be placed back on workers' compensation insurance. According to Vermani, he discussed this with Henderson and she agreed. Henderson, in contrast, testified that she never discussed revoking her rejection of insurance with Vermani. At trial, a copy of a letter allegedly sent to the Fund, dated October 2, 1980, was intro-

1. The other insurers were dismissed prior to trial and are not parties to this appeal.

duced which requested that Henderson be placed back on workers' compensation insurance. The Fund has no record of ever receiving this letter.

In November, 1980, Henderson slipped and fell while walking in an aisleway in Gardner's office. She sustained injuries to her back which required several operations.

Although the cases were consolidated, only Henderson's negligence action against Gardner went to the jury. In this regard, the trial court ruled: (1) that Henderson had presented an adequate case to go to the jury under the Employers' Liability Law, A.R.S. § 23–801, et seq.[2] and (2) that the workers' compensation and Employer's Liability policy issued by the Fund provided coverage to Gardner for Henderson's tort claim.

The jury subsequently returned a verdict in favor of Henderson and against Gardner for the sum of $26,000. Based upon this verdict, the trial court ruled that the Fund's coverage extended to Gardner's liability and in addition awarded Gardner $22,000 in attorney's fees against the Fund. The Fund has appealed the determination that its policy covered the loss and the award of attorney's fees. Gardner has appealed the judgment obtained by Henderson under the Employer's Liability Act.[3]

We turn first to Gardner's appeal. Gardner contends that the trial court erred in submitting to the jury its liability as an employer under the Employer's Liability Law, A.R.S. § 23–801, et seq. The Employer's Liability Law provides that certain employees who are engaged in hazardous occupations may, under certain circumstances, sue their employers for on-the-job injuries, and enjoy the advantages of the doctrine of comparative negligence and the freedom from proving negligence on the part of the employer. *Feffer v. Bowman*, 90 Ariz. 48, 365 P.2d 472 (1961).

There are several prerequisites for such an action by an employee, but central to the resolution of the issue before the court is the requirement that the employee be engaged in a "hazardous occupation" as defined in A.R.S. § 23–803. This statute provides in pertinent part:

The following occupations are hazardous within the meaning of this article:

5. All work on ladders ... elevated twenty feet or more above the ground or floor beneath used in the erection, construction, repair, painting or alteration of the building ... in which a ladder ... is used.

Henderson argues that since she occasionally used ladders 20 feet high to inspect and balance equipment which had been installed by Gardner, this activity placed her within the statutory definition. The trial court agreed, even though Henderson's injuries were received while walking down an office aisleway.

Assuming without deciding that Henderson's employment could be considered hazardous while she was at a job site and was using 20 foot ladders in construction, the question remains whether the employee is protected by the Employer's Liability Law where the injury occurs away from the hazardous activity.

This issue is not without difficulty. First, all of the cases are relatively old. (The latest having been rendered in 1936). Second, the cases do not distinguish, except in dicta, between occupations which are constitutionally declared hazardous and those considered hazardous due to certain aspects of the work involved. Before embarking upon an analysis of the case law on this subject, it is important to categorize the statutory definitions of "hazardous".

Article 18, § 7, of the Arizona Constitution, required the legislature to enact an employer's liability law "to protect the safety of employees in all hazardous occupations, in mining, smelting, manufacturing, railroad or street railway transportation, or any other industry ...." The legis-

---

2. Henderson specifically waived a common law negligence action against Gardner.

3. Gardner is represented by separate counsel in its appeal and its defense of the Fund appeal.

\* \* \* \* \* \*

lature responded to this directive in three ways: First, by declaring that those types of industries specifically mentioned in the constitution were hazardous, that is, mining, smelting, manufacturing and railroading, A.R.S. § 23–803(1), (6), (8) and (10); second, by classifying additional types of industries as hazardous, such as underground construction, (A.R.S. § 23–803(9)); third, by describing certain types of work which by its execution is hazardous: working with explosives (A.R.S. § 23–803(2)); construction work involving iron and steel framework (A.R.S. § 23–803(3)); operating elevators (A.R.S. § 23–803(4)); using electrical current (A.R.S. § 23–803(6)); construction work involving use of ladders over 20 feet high (A.R.S. § 23–803(5)).

Thus the legislature deemed certain types of industry hazardous based upon the nature of the industry itself. It also considered certain aspects of certain industries to be hazardous, depending upon the nature of the activity being conducted.

With this legislative approach to the problem in mind, we now turn to the case law. In *Arizona Eastern R. R. Co. v. Matthews*, 20 Ariz. 282, 180 P. 159 (1919), this state was required for the first time to define what constitutes a hazardous occupation. At issue was whether a "billing clerk"[4] employed by a railroad who stepped into an uncovered hole on his employer's premises, was covered by the employer's liability law because he engaged in the "occupation of a railroad", an occupation the legislature had declared to be hazardous. The court first determined that the billing clerk was not involved in mechanical labor, but more important to our inquiry, stated:

> It is evident that the accident must arise out of and also be inherent in the occupation itself; the condition or conditions that produce the accident must inhere in the occupation.

*Id.* at 289, 180 P. at 162.

The court therefore held that the danger of falling into the hole was not particular to the duties of a billing clerk and concluded that he was not engaged in a hazardous occupation, a prerequisite to the application of the Employer's Liability Law.

The court had occasion to reconsider this issue in *Consolidated Arizona Smelting Co. v. Egich*, 22 Ariz. 543, 199 P. 132 (1921). In *Egich*, a miner was working underground when the head of a sledge hammer he was using to break rock came loose and broke his toe. The employer contended that the risk of a hammerhead coming loose was an ordinary risk of anyone using a hammer and therefore did not constitute a hazardous occupation.

In rejecting this argument, Justice Ross analyzed the court's prior opinions and concluded that the "inherent" theory—that the accident must arise out of a task which in itself was hazardous—was not necessary. Rather, the use of a hammer was a condition of the claimant's work "in the hazardous occupation of mining in which he was engaged when injured." *Id.* at 555, 199 P. at 136. It was this condition of work in an occupation declared to be hazardous which gives rise to the protection afforded by the Employer's Liability Law.

Three years later, in another opinion authored by Justice Ross, *United States Mining Co. v. Hoffman*, 27 Ariz. 97, 230 P. 1099 (2(1924), the court again considered the hazardous occupation problem. *Hoffman* involved a workman employed to build towers for an aerial tramway from a mine to a mill, a distance of about one mile. Hoffman, while working on a tower about midway between the mine and the mill, fell and suffered injuries. The tower was less than 20 feet high.

The basic issue before the court was whether this accident occurred "about a mine" so as to fall within the statutory definition of a hazardous occupation. Without reference to the analysis applied in *Egich*, Justice Ross again embarked upon a

---

**4.** The duties of a "billing clerk" were described as "billing freight, writing up the transfer books, making up tonnage reports, balancing the cash-books, making an abstract, loading and unloading livestock, and sprinkling down hogs during warm weather ...."

determination of the meaning of hazardous occupation. In doing so, he noted that not all construction work was statutorily declared to be hazardous, but only that construction work associated with a particular risk: working on ladders over 20 feet high, working with electricity, working in tunnels, and working "about mines." The court concluded that the legislature intended that the work itself be in fact hazardous or that the work be done or carried on in the "danger zone" incident to the legislatively declared hazardous industry, in that case, a mine. The court then held:

> It is obvious that the work plaintiff was engaged in at the time he was hurt did not bring him into the range of any of the particular dangers and hazards incident to operating a mine and therefore he is not entitled to recover in this action.

*Id.* at 106, 230 P. at 1102.

The next pronouncement on this subject occurred in *Phoenix-Tempe Stone Co. v. Jenkins,* 28 Ariz. 291, 237 P. 194 (1925) where the plaintiff-employee was dumping rock into a crusher using a team of mules. The crusher and the plaintiff's work would qualify under the statutory definition of a hazardous occupation. The plaintiff was injured while hitching the mules to a scraper. The employer contended that hitching mules is not a hazardous occupation. The court held:

> If plaintiff in this case was engaged in an occupation classified as hazardous, defendant was liable for any accident resulting from one of the conditions of the occupation, even though such a condition was not one which had induced the legislature to classify the occupation as hazardous, and which might also exist in a non-hazardous occupation.

*Id.* at 295, 237 P. at 195.

■ From these cases, we believe that the following principles may be gleaned: where an employee is working in an industry which has been legislatively declared hazardous, (the underground miner in *Egich;* the muleskinner in *Jenkins*), then any injury which results from a condition of that employment falls within Employers' Liability Law. However, if the employment is in an industry not specifically declared to be hazardous, (the carpenter in *Hoffman*), the employee at the time of injury must place himself within the specific hazardous aspects of the employment which the legislature has considered to create a hazardous "zone of danger."

■ This analysis comports with the legislative distinction between occupations which are inherently hazardous, and those which are hazardous only because of certain aspects of the occupation. With this analysis in mind, we turn to Henderson's occupation under consideration. She was employed as an estimator for an air conditioning contractor. This is not an industry which is legislatively declared to be inherently hazardous. Thus, she was required to place herself within the boundaries of a specific legislative risk declared to be hazardous (working on a ladder) to be entitled to the protection of the Employers' Liability Law. This she cannot do. She was not injured as the result of a hazardous condition of her occupation and therefore cannot subject her employer to liability under the Employer's Liability Law. Since she specifically waived any common law action against her employer, the judgment against Gardner must be reversed and the matter remanded with directions to enter judgment in Gardner's favor on Henderson's claim.

We now turn to the Fund's contention that it did not afford Employer's Liability coverage to Gardner for injuries occurring to Henderson under its policy.[5]

To understand the positions of the parties, it is necessary to understand what type of industrial accident policy the Fund offers. The State Compensation Fund's

---

5. Although we have held that Gardner was not liable to Henderson under the theory of Employer's Liability and thus it necessarily follows that the Fund, as Gardner's insurer, is likewise not liable, the issue of coverage is not moot as Gardner obtained a judgment for attorney's fees against the Fund on the theory that the policy afforded coverage.

standard policy provides that "in consideration of payment of the premiums,[6] the Fund agrees to offer two types of coverage: Coverage A—"to pay promptly when due all compensation and other benefits required of the insured by the workmen's compensation law"; and Coverage B—"to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury ... by any employee of the insured arising out of and in the course of his employment ...."

It is "Coverage B"[7] which is in dispute here and which the Fund cancelled by its endorsement. Gardner contends that the endorsement cancellation was invalid, because the policy (1) is ambiguous as to cancellation of coverage B upon rejection of coverage A; (2) the endorsement was a unilateral attempt to reduce coverage; and (3) the cancellation is contrary to Gardner's "reasonable expectations"; and (4) that the Fund in fact received a premium based upon Henderson's earnings and therefore is estopped to deny coverage.

We deal with these contentions in order. The ambiguity and unilateral reduction of coverage arguments are combined. Gardner contends that because it was not advised by the policy itself that a rejection by a worker of workers' compensation coverage (and a corresponding reduction in premiums) operated to also cancel Employer's Liability coverage, the Fund could not unilaterally reduce that coverage.

It is clear that both coverages are afforded an employer based upon the payment of a single premium. In the case of workers' compensation insurance, the premium is based upon the employer's payroll. Vermani, Gardner's president, was acutely aware of this and specifically requested several employees, including Henderson, to reject workers' compensation coverage in order to reduce the compensation premium.

When the Fund reacted to this rejection of workers' compensation coverage by Henderson, it was doing nothing more than it was required to do under the terms of the policy—inform Gardner that because no premiums were being paid by Henderson for coverage under the policy, both Coverage A and B had been lost to the extent of injuries incurred by Henderson.

Gardner argues that this result is unfair because the only time that Coverage B is needed is when an employee rejects coverage A. *See Williams v. Magma Copper Co.*, 5 Ariz.App. 236, 425 P.2d 138 (1967); *Industrial Comm'n. v. Orizaba Mining Co.*, 61 Ariz. 52, 145 P.2d 850 (1944). This argument misses the point. Here, Gardner was unambiguously informed that if it wanted Coverage B to remain in effect (the employer now being placed in jeopardy because of the rejection of coverage A) it was necessary for the employer to pay for that coverage. Failure to pay premiums does not result in "unilateral reduction of coverage." It results in the failure of consideration for the coverage provided. There is no obligation for the Fund to provide coverage for which a premium has not been paid.

For the same reason, we reject Gardner's "reasonable expectation" argument. We hold, as a matter of law, no insured has a "reasonable expectation" for insurance protection for which it has not paid or at least expects to pay a premium.

Finally, Gardner argues that the Fund is estopped to deny coverage, since after the accident in January, 1981, the quarterly payment sent to the Fund included a $34.00 amount to cover Henderson under workers' compensation. This same argument was made and rejected in *Cockburn v. Industrial Comm'n*, 7 Ariz.App. 486, 441 P.2d 252 (1968) on the grounds that the acceptance of a premium by the Fund where the amount of any given premium is unascer-

---

**6.** It is undisputed that the amount of the premium paid by Gardner was based upon the compensation paid by it to its covered employees.

**7.** Although coverage B is designated "Employer's Liability", the extent of the coverage is not confined to the losses occurring under the Employer's Liability Law (A.R.S. § 23–801, et seq., previously discussed.) The employer's common law liability would be included under this coverage.

tainable except by audit does not constitute grounds for estoppel.

Based upon the foregoing, the judgment in favor of Gardner against the Fund is reversed and the matter remanded with instructions to enter judgment in favor of the Fund. Our decision in this regard makes it unnecessary to determine whether the amount of attorney's fees was correct.

BROOKS, P.J., and GREER, J., concur.